**O'CONNOR BERMAN DOTTS & BANES**
Second Floor, Nauru Building
1 Nauru Loop
Susupe, Saipan, CNMI
Mail: PO Box 50-1969 Saipan MP 96950
Phone: 234-5684
Fax: 234-5683

**Attorneys for Plaintiffs**

## IN THE DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| MOHAMMED SHAJAHAN ALI, | Civ. No. 07-0018 |
| Plaintiff, | |
| vs. | **OPPOSITION TO MOTION TO DISMISS** |
| MATTHEW T. GREGORY, individually and in his capacity as Attorney General of the Commonwealth of the Northern Mariana Islands, and MELVIN GREY, individually and in his capacity as Director of Immigration for the Commonwealth of the Northern Mariana Islands, | Date: August 30, 2007<br>Time: 9:00 am |
| Defendant, | |

### Introduction

Defendants have moved to dismiss this action, alleging that the controversy is not yet ripe for review, since Plaintiff Ali's appeal from his entry permit denial has not yet come on for an administrative hearing, and thus the denial is not yet final. In support, they attach an administrative order setting the hearing on Mr. Ali's appeal for August 22, 2007.[1]

Defendants' contention that the action is unripe because the denial is not yet final demonstrates that they fundamentally misperceive the nature of the constitutional injury for which Mr. Ali sues. That injury is *not only* the denial of his entry permit renewal application. It is also the very administrative process that he must undergo in appealing from that denial. The upcoming

---

[1] The parties have since agreed to reschedule it for September 19, 2007.

hearing *is* the principal forum at which his right to marital privacy stands to be violated. In other words, the imminent pendency of the hearing is not evidence that the action is unripe. On the contrary, exactly the opposite is the case. It demonstrates that the action could not be riper.

**Argument**

It is of course true, as Defendants state, that a final decision on Mr. Ali's application for an IR entry permit renewal has not yet been rendered by Defendant Gregory, or perhaps even by Defendant Grey.[2] However, the actual or potential denial of the permit is not the only constitutional injury that Mr. Ali labors under. The appeal hearing itself is an infringement on his constitutional right of marital privacy, and that is true regardless of whether his permit ends up being granted or

---

[2]

There is some confusion as to the precise level Mr. Ali's administrative appeal has reached – i.e., whether it is now before the Attorney General, or still before the Director of Immigration.

Mr. Ali's denial notice appears on its face to be a final decision of Defendant Grey, which is appealable to Defendant Gregory. See Denial Letter (Exhibit C to First Amended Complaint) at page 1 ("This letter is to notify you that your application for renewal of your Entry Permit under classification 706(D) is denied. Any person aggrieved by this order may appeal, in writing, to the Attorney General through the Director of Immigration within fifteen (15) days of the date of this order."); id. at page 3 ("The denial of an entry permit may be appealed to the Attorney General by the person denied or excluded within fifteen (15) days of the notice of denial."). Based upon these provisions, Plaintiff Ali directed his appeal to the Attorney General, and his forthcoming hearing was set in response to that appeal.

However, Defendant's Motion to Dismiss appears to assume that the hearing officer is the designee not of the Attorney General, but rather of the Director of Immigration; that the Director's decision is therefore not yet final, but rather tentative pending a further hearing; and that the hearing officer's decision can then be further appealed to the Attorney General. See Defendant's Motion at page 3 ("Defendants would deny that the appeal is pending before Defendant Gregory. . . . Defendants would deny that Defendant Gregory will evaluate and determine the appeal because that outcome is speculative. The issue must first be determined by the administrative hearing officer. Whether an appeal from that decision will occur is unknown.").

This question certainly needs to be resolved within the context of the administrative proceeding, but it is irrelevant for purposes of this civil rights action, because the constitutional injury inheres in the hearing, regardless of the level at which it is conducted.

2

1  denied afterward. The nature of Ali's constitutional claim is evident from the face of the Complaint,
2  in which he alleges that "the *evaluation and determination*" of his entry permit application based
3  upon new 3 CMC § 4372 and new Immigration Regulation § 713 violates his constitutional rights.
4  See First Amended Complaint at ¶ 23. In that Complaint, he seeks "[a] prohibitory injunction
5  enjoining Defendants from *applying or enforcing* new 3 CMC § 4372 and new Immigration
6  Regulation § 713." Id. at Prayer for Relief, ¶ 2. Similarly, in his pending motion for summary
7  judgment or a preliminary injunction, he argues that the incidents of his marriage are "no proper
8  field for *investigation or interrogation* by the Government," and that the challenged law and
9  regulation "promote and indeed require direct governmental intrusion into the private marital lives
10 of every citizen-alien couple." Plaintiff's Motion For Summary Judgment, Or In the Alternative For
11 a Preliminary Injunction at page 6. He seeks an injunction "enjoining Defendants from denying *or*
12 *evaluating* his renewal application pursuant to the challenged laws and regulations." Id. at page 1.

14 The forthcoming administrative hearing will necessarily consist of an inquiry into the matters
15 set forth in the challenged law and regulations as relevant to the grant or denial of a permit renewal,
16 particularly whether or not the marriage is being "maintained" for the sole purpose of obtaining a
17 labor or immigration benefit. See New Imm. Reg. § 713(C)(3)(c) & (d) (Exhibit B to First Amended
18 Complaint). Plaintiff has already stated in his Complaint that he and his wife are living separately
19 (see First Amended Complaint at ¶ 19), so the inquiry at the hearing will involve such questions as
20 *why* that is the case, and *why* Plaintiff and his wife choose to remain married notwithstanding their
21 present physical separation, if not solely for immigration purposes. This will entail an exploration
22 and justification of the nature and sincerity of the couple's feelings for one another; the frequency,
23 nature and content of marital communications; their mutual plans for the future or lack thereof, etc.
24 Sexual issues will, of course, also inevitable arise. Plaintiff will be effectively compelled to
25 disclose, and put in the scales to be judged, a wide panoply of information regarding the intimate
26 details of his marital relationship, in order to counter the impression created by the physical

1  separation. The hearing will be a comprehensive disclosure and search of the marital *res*.

3  Plaintiff believes that the Constitution protects him and his marriage from such a disclosure
4  and such a search. He believes that it protects him not only from denial of his application based
5  upon the challenged law and regulations, but also from the very *line of inquiry* that those regulations
6  contemplate and necessitate. As the Court stated in Dabaghian v. Civiletti, 607 F.2d 868, 870 (9th
7  Cir. 1979), "*the very effort to apply* the 'factually-dead' [marriage] test would trench on
8  constitutional values." The court in Chan v. Bell, 464 F.Supp. 125 (D.D.C. 1978) (approved in
9  Dabaghian), elaborates as follows:

> If marriage viability represents a valid notion in the law it logically also embraces such matters as sexual compatibility, financial security, family relationships, and the emotional attitudes of the spouses all of which bear significantly upon the health and potential duration of the marriages, that is, their viability. How, it may legitimately be asked, would the Service go about collecting evidence on these various subjects? *What issues would be tried before the INS hearing officers and upon what standards?* How would the parties go about exonerating themselves since theirs is the burden of proof and since INS has ruled in this case that they must make an "affirmative showing" that the marriage has a reasonable chance of continuing? To consider these questions is to conclude that the viability standard, if allowed to persist, would *inevitably lead the INS into invasions of privacy which even the boldest of government agencies have heretofore been hesitant to enter*.

Id., 464 F.Supp. 125 at 130 n.13 (citations omitted, emphasis added). Like the now-defunct "viable"
or "factually-dead" marriage standard at issue in Dabaghian and Chan, the expansion of the
"fraudulent marriage" inquiry from the parties' state of mind at the time of their first entry into the
marriage (the only permissible inquiry in the federal system) into a yearly inquisition into why the
marriage is still being "maintained" is not an "insignificant step," but rather "represents an intrusion
into the most sensitive and private areas of life and has extremely dangerous implications." Chan,
supra, 464 F.Supp. at 130 (citations omitted).

It has been recognized in other, related, contexts as well that a mere inquiry or search can
constitute an infringement on constitutional privacy rights, even when no adverse actions necessarily
flow from the investigation. See, e.g., Griswold v. Connecticut, 381 U.S. 479, 485-86 (1965)

4

("Would we allow the police to *search* the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives?  The very idea is repulsive to the notions of privacy surrounding the marriage relationship.") (emphasis added); NAACP v. Alabama, 357 U.S. 449 (1958) (holding that the right to freedom of association precludes compelled disclosure of the membership lists of an organization, even when the organization itself is under no legal proscription) (cited in Griswold as another facet of privacy right recognized therein).  In the context of marriage, the privacy of information itself has long been recognized in the common-law marital communications privilege.  See Blau v. United States, 340 U.S. 332, 333 (1951) (marital communications are presumptively privileged); Wolfle v. United States, 291 U.S. 7, 14 (1934) ("The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails."); Stein v. Bowman, 38 U.S. (13 Pet.) 209, 223 (1839) ("To break down or impair the great principles which protect the sanctities of husband and wife, would be to destroy the best solace of human existence.").  See generally Kasza v. Browner, 133 F.3d 1159, 1180 (9th Cir. 1998) (Tashima, J., concurring in part) (noting that the purpose of the common-law privileges, including the husband-wife privilege, is "keeping certain kinds of information secret.  Secret from the court.  Secret from the jury.  Secret from the world.").

The forthcoming administrative hearing of Mr. Ali's appeal will necessarily delve into confidential marital information.  The controversy is thus directly upon us.  Mr. Ali's claim does *not* rest upon "future events that may not occur as anticipated, or indeed may not occur at all."  Cf. Defendants' Motion at 3.  On the contrary, it rests on events that are already scheduled to occur.

Plaintiff's position is analogous to that of the plaintiffs in O'Neill v. Louisiana, 61 F.Supp.2d 485 (E.D. La. 1998).  In O'Neill, certain state elected officials challenged the constitutionality of a state statute requiring state officials to submit to random drug tests.  Failure of the test would result

5

1 in a censure and/or fine. The plaintiffs argued – and the court agreed – that the testing would violate their constitutional rights under the Fourth Amendment prohibition on unreasonable searches and seizures. None of the plaintiffs in the O'Neill case had actually been tested yet, much less censured or fined after failing a test. Yet the court noted at the very outset of its opinion that, since the necessary funds for the testing program had been allocated and a proposed screening plan was in place, the controversy was "*ripe for review*." Id. at 487 (emphasis added). Here too, the administrative process itself, and not just its actual or potential results, *is* the constitutional injury. Since that process is not just in place, but actually underway, Plaintiff Ali's challenge to it is fully ripe and should proceed.

**Conclusion**

For the foregoing reasons, Mr. Ali's claim is very much ripe for review, and the Defendants' Motion to Dismiss should accordingly be denied.

Respectfully submitted this 26th day of July, 2007.

                                                O'CONNOR BERMAN DOTTS & BANES
                                                Attorneys for Plaintiff

                                                By:_____/s/_____
                                                            Joseph E. Horey

*3359-01-070725-PL-M to dismiss-OPP BR.wpd*