**O'CONNOR BERMAN DOTTS & BANES**
**Second Floor, Nauru Building**
**1 Nauru Loop**
**Susupe, Saipan, CNMI**
**Mail: PO Box 50-1969 Saipan MP 96950**
**Phone: 234-5684**
**Fax: 234-5683**

**Attorneys for Plaintiffs**

**IN THE DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| MOHAMMED SHAJAHAN ALI, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> MATTHEW T. GREGORY, individually and ) <br> in his capacity as Attorney General of the ) <br> Commonwealth of the Northern Mariana ) <br> Islands, and MELVIN GREY, individually ) <br> and in his capacity as Director of Immigration ) <br> for the Commonwealth of the Northern ) <br> Mariana Islands, ) <br> ) <br> Defendant, ) <br> _____) | Civ. No. 07-0018 <br><br> REPLY IN SUPPORT OF <br> MOTION FOR <br> SUMMARY JUDGMENT, <br> OR IN THE ALTERNATIVE <br> FOR A PRELIMINARY <br> INJUNCTION <br><br> Date: August 30, 2007 <br> Time: 9:00 am |

**Introduction**

Plaintiff, an immediate relative (706D) permit renewal applicant, seeks summary judgment in his favor finding new 3 CMC § 4372 and new Immigration Regulation § 713 unconstitutional. In the alternative, he seeks a preliminary injunction enjoining Defendants from evaluating his pending application under those challenged laws and regulations until such time as their constitutionality can finally be determined.

Defendants' Opposition to Plaintiff's motion is based on three premises: 1) that the federal system for affording "immediate relative" immigration status on the basis of marriage is constitutional; 2) that the CNMI system for doing the same is therefore also constitutional to the extent that it resembles the federal system; and 3) that the CNMI system does not differ from the federal system in any significant way.

The first of these premises -- the constitutionality of the federal system – is not as unassailable as Defendants appear to think it is.  In fact, "neither the Supreme Court nor this [Ninth] circuit have ruled on the constitutionality of [former] § 1154(h)[1] or any substantially similar provision of the Immigration and Naturalization Act," Blancada v. Turnage, 891 F.2d 688, 690 (9th Cir. 1989), and at least one district court has expressly held former § 1154(h) to be unconstitutional.  See Manwani v. U.S. Dept. of Justice, Immigration and Naturalization Service, 736 F.Supp. 1367 (W.D.N.C. 1990).  The constitutionality of the federal system is not at issue in this case, however, and for present purposes we may assume *arguendo* that it is constitutional in all particulars.  Defendants' other two premises, however, are demonstrably wrong.

**Different Constitutional Standards Apply To Federal and CNMI Immigration Laws**

The constitutionality of the federal system is no guarantee that the same system would be constitutional in the CNMI, even if the two systems were identical, which (as shown in the following section) they are not.  Where challenged elements of the federal system have been upheld, it has been on the basis of the extremely deferential standard of review applied to federal immigration legislation by the federal courts – i.e., the standard articulated in such cases as Fiallo v. Bell, 430 U.S. 787, 792 (1977) ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation.").  See, e.g., Anetekhai v. Immigration and Naturalization Service, 876 F.2d 1218, 1222 (5th Cir. 1989) ("Applying the deferential standard of review articulated in Fiallo to the case before us, we have no difficulty in concluding that § 1154(h) passes constitutional muster.").[2]

---

[1] 8 U.S.C. § 1154(h) (now § 1154(g)), a federal anti-"sham marriage" measure, which bars an alien who married a citizen during the pendency of deportation proceedings against him from acquiring immediate relative status based on the marriage until he had resided outside the United States for a 2-year period beginning after the date of the marriage.

[2] *But see* Manwani, supra, 736 F.Supp. at 1388-89 (applying strict scrutiny based on infringement of fundamental right to marry); id. at 1389-92 (concluding that former § 1154(h)

2

This deferential standard, however, has expressly been considered and rejected for application in the CNMI, which instead requires (at a minimum) an intermediate level of scrutiny in assessing the constitutionality of immigration legislation. See Sirilan v. Castro, 1 C.R. 1082 (D.N.M.I. App. Div. 1984), at 1096-97 (finding that the distinctions between federal and CNMI immigration authority warrant a "clean slate" approach (cf. Fiallo, supra, at 792 n.4 (eschewing "clean slate"))), 1101-02 (reviewing the rational-basis rule of Fiallo and similar federal cases), 1120-21 (rejecting the deferential rational basis test), 1130 ("We hold today that legislation which discriminates among non-citizens or which infringes upon important individual interests will survive constitutional review only upon a convincing, well supported showing that the classification substantially serves to achieve important governmental interests."). See also Chun Nam Kim v. Commonwealth of the Northern Mariana Islands, 3 C.R. 608, 612-13 (D.N.M.I. 1989) (adopting Sirilan analysis).

It may be, therefore, that the law and regulations challenged in this case would be held constitutional had they been enacted by the US Congress, the INS, or its successor agencies. Even if so, however, that does not mean that they are constitutional when adopted by the CNMI. For the reasons stated in Plaintiff's opening brief in support of this motion, they are not.

### Federal and CNMI "Immediate Relative" Assessments Differ Sharply

It is simply untrue that "the nature of the CNMI regulations is [not] substantively different from the constitutionally sound federal requirements." Cf. Opposition at 3. On the contrary, they differ enormously. Defendants themselves admit as much when they refer to the federal five-year period of scrutiny "albeit retroactive at the time of the initial application based on the second

---

would not survive even deferential Fiallo scrutiny).

marriage." Opposition at 3. That is one big "albeit," because it sums up in one word the crucial difference between the two systems, namely the point in time that is the focus of government scrutiny of the marriage. In the federal system, only one single moment in time is relevant – the time of entering into the marriage. So long as the couple is determined to have married in good faith *at that time*, their marriage will never be found to be fraudulent, and the alien spouse's immigration status as an immediate relative will be secure. See, e.g., Damon v. Ashcroft, 360 F.3d 1084, 1089 (9th Cir. 2004) ("The *sole* inquiry in determining whether a marriage was entered into in good faith is whether the parties intended to establish a life together *at the time of marriage*.") (emphasis added); Dabaghian v. Civiletti, 607 F.2d 868, 869 (9th Cir. 1979) ("If a marriage is not a sham or fraudulent *from its inception*, it is valid for purposes of determining eligibility for adjustment of status under §245 of the Act until it is legally dissolved.") (emphasis added); Bark v. Immigration and Naturalization Service, 511 F.2d 1200, 1202 (9th Cir. 1975) ("Conduct of the parties after marriage is relevant only to the extent that it bears upon their subjective state of mind *at the time they were married*.") (emphasis added).

Yes, there is continued scrutiny for a period after the marriage, but that scrutiny still focuses on the time of entering into the marriage. Evidence of what happened afterward – including separation of the spouses – is relevant *only* to the extent that it sheds light on the couple's intent at that initial nuptial moment. For example, the purpose of the 2-year post-marital review of a couple that married in 2005 is to confirm that they married in good faith *in 2005*, not to evaluate and pass judgment on the state of their marital relationship in 2007.

> We find no requirement in the statute . . . that a marriage, once lawfully performed according to state law, is deemed to be insufficient proof of a "valid marriage" merely because at some later time the marriage is either terminated, or the parties separate. The only proof in this case establishes that petitioner's marriage is not terminated. So far as the record discloses the facts, she is today married to Whetstone although they are not living together. There is no requirement that a marriage, entered into in good faith, must last any certain number of days, months or years. Much less is there any requirement that a bona fide and lasting marital relationship (whatever that may mean) exists as of the time the INS questions the validity of the marriage.

1   Whetstone v. Immigration and Naturalization Service, 561 F.2d 1303, 1306 (9th Cir. 1977) (in which
2   the parties had separated after only 30 days of marriage).  See also Bark v. Immigration and
3   Naturalization Service, 511 F.2d 1200, 1202 (9th Cir. 1975) ("[E]vidence of separation, standing
4   alone, cannot support a finding that a marriage was not bona fide when it was entered."); Matter of
5   McKee, 17 I.&N. Dec. 332, 333, 1980 WL 121883 (USDOJ Board of Immigration Appeals 1980)
6   (INS agrees that, "where the parties to a marriage were living apart, but there was no contention that
7   the marriage was a sham at its inception in that it had been entered into for the purpose of evading
8   the immigration laws, the Service could not deny the visa petition solely because the parties were
9   no longer living together.").

11      In the CNMI system, by contrast, each new year of the marriage is evaluated independently.
12   An IR permit is renewed yearly,[3] and the statutory power of the Director of Immigration under the
13   challenged law includes the power to "deny . . . an application for *renewal* of an existing entry
14   permit," based on an evaluation whether "*said application*" (*not* the original marriage) was based
15   on "fraudulent grounds."  3 CMC § 4372(a) (emphasis added).  Rather than focusing solely on the
16   time of marriage, therefore, the analysis focuses on the entire duration of the marriage.  The federal
17   determination regarding a 20-year marriage is based on a single day; the CNMI determination is
18   based on the whole 20 years, one year at a time (or even more frequently, sine the Director also has
19   the power to "revoke an existing permit").  Every citizen-alien marriage is thus on eternal probation.

21      This is evident from the particular requirements of the statute and regulations.  Of the
22   statutory grounds for finding fraud, only the first ("that the spouses had little of no personal contact
23   with each other prior to the marriage") is clearly expressed in the past tense, and relevant only to the

---

[3] See CNMI Immigration Regulation § 706(D), 27 Com.Reg. 24052 (Feb. 2005) ("permits immediate relatives of persons who are not aliens to remain in the CNMI *for one year* so long as the immediate relative status is in effect") (emphasis added).

5

couple's state of mind at the time of entry into the marriage. See 3 CMC § 4372(b)(1). The second, by contrast, is "that either one of the spouses resides primarily outside of the spousal residence and the circumstances indicate that the spouses do not intend to share the same residence." 3 CMC § 4372(b)(2). This is explicitly framed in the present tense, and is applicable anew at each year's renewal. It can therefore be applied to find marriages fraudulent and to deny permit applications in situations where the spouses, despite having entered into the marriage in complete good faith, and despite having lived together for some period of time (however long) after the marriage, subsequently separate, for whatever reason. Indeed, it can be used to justify direct governmental intrusion of the most offensive and obnoxious nature into the present status of the every citizen-alien marriage. See, e.g., Declaration of Md. Tariqul Islam, attached hereto (Immigration agents appearing in the middle of the night to demand why husband is not present in wife's home, and threatening adverse consequences if a couple not living together does not divorce). The third statutory factor also ("based on post-marital interviews and investigations conducted by Law Enforcement Officers [capitalization in original], that the couple does not have at least a minimal personal knowledge of the other's background, beliefs, practices and habits as would be expected of a couple living as man and wife," 3 CMC § 4372(b)(3)) implicitly requires that the couple continue "living as man and wife" indefinitely after the marriage, and have ongoing knowledge of "practices and habits" that are liable to change over time.[4]

The development of additional requirements is left to the Attorney General, see 3 CMC § 4372(b)(4), and he has created four factors of his own by regulation, at least three of which must exist for a permit to be approved. The first requires the couple to swear, annually, that they "will share the same place of residency in the CNMI." New Imm. Reg. § 713(C)(3)(a), 29 Com. Reg. 26416 (Jan. 2007) (emphasis added). The second requires the sponsoring spouse -- again annually

---

[4] On the other hand, "background" seems to refer to pre-marital history only.

– to "demonstrate[] residency in the CNMI." Id. at § 713(C)(3)(b). The third provides for interviews with the Director of Immigration or his designee, "at any time prior to *the annual renewal of the permit*," in order to determine "that the marriage is not being *maintained* for the sole purpose of obtaining a labor and immigration benefit." Id. at § 713(C)(3)(c) (emphasis added). And the fourth likewise requires evidence "that the sole purpose of the *maintaining* the marriage is not to obtain a labor or immigration benefit." Id. at § 713(C)(3)(d) (emphasis added).

It cannot be emphasize strongly enough that applications for an *initial* permit and applications for the *renewal* of a permit are clearly and sharply distinguished in the regulations:

> The purpose of the interview is solely for the purpose of determining whether the couple intends to establish a life together *if an initial interview*, and *if a subsequent interview*, the purpose shall be to determine that the marriage is not being maintained for the sole purpose of obtaining a labor and immigration benefit.

Id. at § 713(C)(3)(c) (emphasis added).

> The sponsoring spouse provides such other evidence that, when viewed cumulatively, would lead a reasonable person to believe that the couple intends to establish together *if an initial application*, or *if a renewal*, that the sole purpose of the maintaining the marriage is not to obtain a labor or immigration benefit.

Id. at § 713(C)(3)(d) (emphasis added). The standard of "intent to establish a life together at the time of marriage" – the sole federal inquiry both at the time of the initial application and all follow-up scrutiny (see above) – is, in the CNMI the inquiry *only* at the time of the initial application. Afterward, for the entire remaining duration of the marriage, there is a new, separate and ongoing inquiry as to why the marriage is being *maintained* – i.e., why it continues to subsist, why it has not been terminated, why the couple chooses to remain married (a question that, over the course of any marriage, may well have numerous different answers).

Once the issue is renewal, therefore, the CNMI system is indistinguishable from the "factually-dead" marriage test that was denounced in Chan v. Bell, 464 F.Supp. 125 (D.D.C. 1978), and Dabaghian v. Civiletti, 607 F.2d 868 (9th Cir. 1979), and that the INS itself has expressly

7

1  rejected.  See Matter of McKee, 17 I.&N. Dec. 332, 1980 WL 121883 (USDOJ Board of
2  Immigration Appeals1980).  As under the discredited "factually dead" or "non-viable" marriage
3  standards, the government is required to intrude directly and repeatedly into the heart of the marital
4  relationship.  Here, as in Chan, Defendants try to minimize the enormity of what they are doing.  See
5  Chan, 464 F.Supp. at 130 ("Defendant suggests that the Service's departure from domestic relations
6  law as a basis for ascertaining the existence of a marriage relationship constitutes but an
7  insignificant step.").  In fact, however, and again as in Chan, "that departure represents an intrusion
8  into the most sensitive and private areas of life and has extreme dangerous implications." Id. (citing
9  Griswold v. Connecticut, 381 U.S. 479 (1965); Roe v. Wade, 410 U.S. 113 (1973)).  It is a departure
10 that, on its very face, violates the constitutional rights of Plaintiff, and all others similarly situated
11 to him.

**Conclusion**

For the foregoing reasons and all the reasons set forth in Plaintiff's opening brief in support of this motion, summary judgment, or, in the alternative, a preliminary injunction should be granted in favor of Plaintiff in this matter.

Respectfully submitted this 2nd day of August, 2007.

O'CONNOR BERMAN DOTTS & BANES
Attorneys for Plaintiff


By:_____/s/_____
         Joseph E. Horey

*3359-01-070801-PL-M summary judment-REP BR.wpd*